IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| RONALD MATRISCIANO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 03-3072 |
| | ) |
| ROGER E. WALKER, JR., Director of the | ) |
| Department of Corrections of the State of | ) |
| Illinois, and DONALD SNYDER, | ) |
| | ) |
| Defendants. | ) |

## OPINION

RICHARD MILLS, U.S. District Judge:

Defendants' motion for summary judgment is allowed.

## I. BACKGROUND

This is an action pursuant to 42 U.S.C. § 1983, wherein the Plaintiff alleges that he was retaliated against for exercising his First Amendment right to freedom of speech.  He has also asserted a count which alleges that the Defendants have violated the Illinois State Personnel Rules.  The Plaintiff's third amended complaint also appears to direct a First

1

Amendment count against Michael M. Rumman, the Director of the Illinois Central Management Services.  Count IV seems to allege that Rumman conspired with Defendant Roger E. Walker, Jr.  Defendants Walker and Donald Snyder have moved for summary judgment.

A. Defendants' proposed undisputed material facts

1.

On September 1, 1980, Plaintiff Ronald Matrisciano commenced his employment with the Illinois Department of Corrections ("IDOC") as a Correctional Parole Counselor I.  He was promoted several times throughout his career with IDOC, serving in positions such as:

- Correctional Parole Counselor II, September 16, 1981;

- Correctional Parole Assistant Supervisor, April 16, 1986;

- Chief of Security, March 23, 1988;

- Correctional Leisure Activity Specialist, July 1, 1991;

- Correctional Community Center Specialist, January 10, 1992;

- Senior Public Service Administrator at Joliet Community Correctional Center, September 16, 1993 to December 31, 1995;

2

●Assistant Warden of Operations at Dwight Correctional Center, January 1, 1996;

●Assistant Warden of Operations at Joliet Correctional Center, September 21, 1998;

●Administrator of the Division of Field Operations, June 1, 1999;

●Warden of Joliet Correctional Center, February 15, 2001; and

●Assistant Deputy Director of District 1, July 1, 2002.

The Plaintiff was laid off from June 24, 1982 to February 1, 1984 and from August 20, 1987 to March 23, 1988.

Defendant Donald N. Snyder, Jr. was Director of IDOC from January 19, 1999 through February 23, 2003, and Acting Director from March 15, 2003 through June 1, 2003.  He reported directly to the Governor of Illinois.  Another Defendant, Roger E. Walker, Jr., is the duly  appointed and confirmed Director of IDOC, as of June 1, 2003.

Defendants allege that the assistant deputy director position within IDOC was created by IDOC, with the approval of the Department of Central Management Services.  A position description for that position was

3

established by the Department of Central Management Services with the input of IDOC. Since 1999, the position description for an assistant deputy director has been modified at least two times to make minor changes in the duties. However, the duties have remained substantially the same. On July 1, 2002, the Plaintiff became the Assistant Deputy Director of District 1[1] at IDOC.

Defendants allege that in December 2002, within the chain of command at IDOC, wardens and other subordinate staff reported to the Plaintiff, who reported to the deputy director, who reported through the chain of command to Associate Director George DeTella, then Defendant Snyder, and finally the Governor of Illinois. Plaintiff disputes that he reported to a deputy director when he was the assistant deputy director. The Deputy Director of District 1 died on the same day that the Plaintiff was appointed to his position. The deputy director position was not filled during Plaintiff's tenure as assistant deputy director.

Defendants contend that the Plaintiff's responsibilities as assistant

[1]Illinois is divided into five different districts.

deputy director included: supervising and evaluating the performance of all Adult Transition Centers and correctional facilities in District 1; assisting in the review and assessment of facilities, programs, and activities; initiating change as needed; ensuring IDOC's philosophy, directives, policies and procedures are effectively administered; and supervising staff in Cook, Lake and Will Counties, subject to the approval of staff up through the chain of command.  Plaintiff disputes Defendants' contentions, asserting that his duties included overseeing administrative personnel assigned to the facilities and offices within his region and supervising the wardens at Stateville and Joliet.

Defendants further claim that Plaintiff himself described his responsibilities as, inter alia, being responsible for the Stateville Correctional Center (a maximum security penal institution), being responsible for community based work release transition centers, and developing policy for a new reception and classification center.  Plaintiff says that this misstates his resume.  He was not responsible for Stateville Correctional Center; rather, he "administered the management" of Stateville.  Moreover, Plaintiff

simply "administered" the programs at community based work release centers.  Finally, Plaintiff disputes that he developed policy; he alleges that the resume reads as follows: "Assigned to oversee the new construction, staffing and policy development of the new Northern Reception and Classification Center."

Defendants next allege that as an assistant deputy director, Plaintiff reviewed and approved policies for IDOC such as those on August 6, 2002, August 28, 2002, September 23, 2002, October 8, 2002 and November 7, 2002.  Plaintiff disputes this, contending that when he "approved" policies, it simply meant that he had no objection to them.  His input was only to express his opinion or comment on whether he liked the policy.

Assistant deputy directors were responsible for enforcing, reviewing and commenting on the agency policies.  Wardens were in charge of setting institutional policies and, as an assistant deputy director, Plaintiff supervised the wardens in his district.  Defendants further allege that in this capacity, Plaintiff also made recommendations regarding IDOC's policies. Plaintiff claims that he does not recall making recommendations regarding

6

policies.  Defendants allege that the assistant deputy director position of IDOC is Rutan[2] exempt.  But Plaintiff disputes this allegation, contending that there is no evidence regarding whether his position was Rutan exempt.

2.

Defendants allege that on September 27, 1973, Billy Logan was shot to death in Chicago.  Harry Aleman was indicted in December 1976 for the murder.  Aleman was tried and acquitted on May 24, 1977 before Judge Frank Wilson, a circuit judge in Cook County.  Judge Wilson was bribed $10,000.00 by Aleman to be found not guilty for the murder of Logan.  Aleman also paid a witness to testify falsely that Aleman had not shot Logan.

Defendants contend that in October 1975, Aleman shot and killed Anthony Reitinger because Reitinger allegedly neglected to pay local organized crime figures to operate his bookmaking operation.  In 1978, Aleman was convicted of one count of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act; one count of violating RICO;

---

[2]Rutan v. Republican Party of Ill., 497 U.S. 62 (1990).

and one count of transporting stolen goods in interstate commerce. Aleman was sentenced to thirty years in the federal penitentiary. In a 1990 federal prosecution, Aleman pleaded guilty to engaging in unlawful criminal activity by collecting for an organized crime group on sporting events and street taxes from independent bookmakers.

Defendants allege that after two witnesses from the Federal Witness Protection Program presented information to law enforcement authorities regarding Aleman's bribe of Judge Wilson and the refusal of Reitinger to pay bookmaking taxes to the Chicago mafia (including Aleman), the Cook County State's Attorney in December 1993 charged Aleman for the murders of Logan and Reitinger. A jury convicted Aleman of both murders and the state court sentenced him to 100 to 300 years imprisonment. Defendants contend that after Aleman arrived at IDOC from federal custody, Plaintiff was asked by Aleman and his grandson to testify on behalf of the parole of Aleman.

Plaintiff says that the aforementioned facts pertaining to Harry Aleman are immaterial to the issues presented in this case. Plaintiff also

claims that Defendants are purporting to rationalize the reasoning behind their behavior by attempting to demonstrate negative facts about Aleman.

3.

On December 17, 2002, Plaintiff appeared before the Prisoner Review Board and read a statement in support of the release on parole of Aleman. Plaintiff stated to the Board that he was speaking in his professional capacity as an administrator of IDOC. To prepare for his testimony before the Board, Plaintiff obtained information from the inmate masterfile of Aleman. In his testimony, Plaintiff discussed the programs in which Aleman was involved while incarcerated; the disciplinary record of Aleman; the respect that Aleman displayed toward staff and other inmates; conformance with IDOC rules and policies; the programs and support Aleman would receive outside of prison, if he were released; and Aleman's likelihood of recidivism.

Defendants allege that in his statement, Plaintiff informed the Board that he had worked in various positions with IDOC; that as a correctional professional with twenty-two years of experience, he was willing to go on

record and appear in support of the release of Aleman; that he was speaking at the hearing in his professional capacity; and that in his professional opinion, it would serve no penological purpose to further incarcerate Aleman. Plaintiff asserts that Defendants take out of context the statement about speaking in his professional capacity. At the hearing the Plaintiff simply stated, "Speaking in my professional capacity, Harry has been a model inmate."

Defendants next allege that Plaintiff had not testified before the Prisoner Review Board for the release to parole of any inmate, except Aleman, who has been convicted of two murders, burglary and organized crime, and both state and federal courts have identified Aleman as having bribed a state court judge in his first trial for the murder of Logan. Plaintiff claims that these facts about Aleman are immaterial and it is his First Amendment rights which are important in this case.

4.

Defendants next allege that on December 18, 2002, Deputy Director George DeTella changed Plaintiff's responsibilities from being Assistant

10

Deputy Director of District 1 to being in charge of statewide parole.
Plaintiff disputes this allegation, contending that DeTella wrote a memo
that Plaintiff's duties would include statewide parole. Additionally, Director
Snyder approved of the assignment.

After Plaintiff's testimony before the Prisoner Review Board, IDOC
received what it perceived to be negative press because of the Plaintiff
supporting the parole release of Harry Aleman. IDOC also received
information that members of the Prisoner Review Board were not happy
with Plaintiff's testimony and the position in which one of the Prisoner
Review Board members was placed.

Sergio Molina, the Chief of Communications for IDOC in December
2002, made Director Snyder aware of the information about Plaintiff and
the Prisoner Review Board. Effective December 26, 2002, the Parole
Division no longer reported to Plaintiff. Director Snyder ordered Deputy
Director DeTella to reassign the duties of Plaintiff from statewide parole to
the Stateville Reception and Classification Center. The Stateville Reception
and Classification Center was not an open facility at the time Plaintiff was

transferred.  He replaced an assistant warden to oversee final construction phases.

Defendants allege that Director Snyder reassigned Plaintiff until an investigation could be made into what occurred with regard to the Plaintiff's support for the release on parole of Aleman to the members of the Prisoner Review Board.  Plaintiff disputes this allegation, contending that he was reassigned because the media had been contacted about the testimony and Snyder wanted him disciplined for testifying.  Defendants further allege that pursuant to the personnel code, Snyder had the discretionary authority to change the duties and responsibilities of the Plaintiff, which allowed for the transfer within his particular job title in his county of residence.  While acknowledging that Snyder had this authority,  Plaintiff contends that it is not relevant to the issue, given that the Plaintiff asserts he was transferred because of his exercise of a constitutional right.

Defendants next allege that Plaintiff was not demoted in rank or salary between December 17, 2002 and May 30, 2003, and remained a senior public service administrator.  Plaintiff says that while he did remain a senior

12

public service administrator according to Central Management Services, IDOC is a para-military organization, and an assistant deputy director's rank is higher than that of a warden. Between December 20, 2002 and December 23, 2002, Snyder requested that Plaintiff and others be granted an extension of employment to participate in the Early Retirement Incentive Program, and this was submitted by IDOC to the Bureau of the Budget of the Office of the Governor. Defendants contend that despite the request by Snyder for the extension, Plaintiff--in addition to Keith Cooper, another assistant deputy director--was denied the extension and the extension request of DeTella was reduced from a four-month extension to a one-month extension. Plaintiff disputes this allegation, contending that while he was denied an extension, Cooper obtained a 75-day contract and remained with IDOC.

5.

Defendants contend that at the end of George Ryan's term as Governor, there was a severe budget crisis and the Director of IDOC was advised to send layoff proposals to the Office of the Governor. Plaintiff

13

contends that there is no evidence that Snyder was advised to send a layoff proposal to the governor.[3]  Defendants also assert that the governor's office requested IDOC's personnel office to identify layers of management in anticipation of laying off management personnel.  Plaintiff disputes this, claiming that Snyder stated only that: "What I recall is the only conversation that I had [after January 1, 2003] was that [the governor's office] wanted a list of the layers of rank within the department of corrections."

A preliminary layoff plan was submitted by IDOC for the elimination of layers of management (which proposed, inter alia, the abolition of the assistant deputy director position and their office staff) and sent to the Director of the Department of Central Management Services.  A proposed layoff package, which included the assistant deputy director and their staffs, was submitted by IDOC to the Director of Central Management Services on or about May 2, 2003.  Defendants contend that the assistant deputy

---

[3]Plaintiff alleges that the portion of Snyder's deposition cited by Defendants does not support this assertion.  Moreover, he contends that Defendants should not be able to use the testimony of Nancy Bounds for this purpose, because Plaintiff was allowed to depose her only for the limited purpose of whether he was a policymaker.

director position for IDOC could be terminated by a layoff approved by Central Management Services.  Plaintiff disputes this allegation, contending that there is no evidence in the record to substantiate the claim by Nancy Bounds and that the Plaintiff was not permitted to question Ms. Bounds on this issue.

The layoff plan was approved by the Department of Central Management Services.  Effective May 30, 2003, the assistant deputy directors and their staffs, including the Plaintiff, were laid off and, as part of the layoff package, the assistant deputy director position was abolished. Plaintiff was notified by IDOC and by the Director of Central Management Services of his layoff status.  Defendants allege Plaintiff has no factual information that his May 2003 layoff was connected to his testimony before the Prisoner Review Board.  Plaintiff disputes this assertion on the basis that it is a legal conclusion.

It appears that Plaintiff should have been placed on a recall list such that he could have been recalled for a position as a public service administrator.  The recall list of employees who have been laid off from their

state employment is generated and maintained by the Department of Central Management Services. But Defendants allege that the recall list is not maintained by IDOC. Plaintiff disputes this, contending that while IDOC may not have physical possession of the recall list, the list is based upon information that is typed into the computer or on a Central Management Services form which is inputted by IDOC. Defendants assert that IDOC had no control over the layoff list. Plaintiff disputes this as well, claiming that the layoff list was allegedly proposed and signed by Director Snyder.

Plaintiff contacted several state employees complaining that he had not received a position to which he was entitled. The matter was investigated and Central Management Services determined that Plaintiff had not appeared on the recall list due to a computer error. Defendants allege that Plaintiff was then placed on the recall list, was awarded a position to which he was entitled and waived back pay at the rate of the public service administrator, the position to which Plaintiff was eligible for recall. Plaintiff claims that allegation is immaterial, asserting that he was

16

recalled only after filing a civil service action.

Defendants contend that Plaintiff has no information that the Director of IDOC and the Director of the Department of Central Management Services discussed Plaintiff's situation in which he was not recalled from the layoff list. Plaintiff says that this allegation is immaterial and is a conclusion. Defendants further allege that Plaintiff returned to Stateville Correctional Center for one day and then was locked out of the facility pending an investigation by the ISP and the federal government because of his testimony before the Prisoner Review Board. Moreover, Plaintiff has been placed on administrative leave since his lock-out from the institution. But Plaintiff claims these allegations are immaterial. He acknowledges that he has been on lock-out status getting full pay for almost one year and he further claims that he has not been informed why he is on lock-out status.

B. Plaintiff's proposed undisputed material facts

Plaintiff has proffered several additional material facts which he claims defeat Defendants' motion for summary judgment. He alleges that IDOC

is a para-military organization.  In this organization, an assistant deputy director's rank is higher than that of the warden.

Next, Plaintiff alleges that his duties at the Jesse Ma Houston Community Correctional Center would entail his having significant contacts with inmates.  Defendants dispute this allegation and contend that, pending the outcome of an investigation into what Plaintiff had done in preparing to, and in testifying in favor of, Aleman's release to parole, Director Snyder transferred Plaintiff to the Joliet Reception and Classification Unit, where there were no inmates because the facility had not yet opened.  Defendants note, moreover, that the Jesse Ma Houston Center is not the same facility as the Joliet Reception and Classification Unit.  If Plaintiff had been assigned to the Jesse Ma Houston Center, which is an adult transition facility just prior to being released on parole, then Plaintiff would have had contact with those residents, who also have contact with the general public. However, residents at the Jesse Ma Houston Center are not similarly situated to inmates who are incarcerated and who are not allowed contact with the general public.

18

Plaintiff next alleges that if he had chosen to work at Jesse Ma Houston, he would not be eligible to remain in the house that he was currently living in through IDOC. Defendants counter that this allegation is immaterial in that he was not offered a position at the Jesse Ma Houston Center. They acknowledge, however, that if Plaintiff had been offered such a position, he would not have been eligible to remain in his state-paid house.

According to the personnel rules, Plaintiff should have been recalled to one of the positions that became available in June 2003. Plaintiff contends that there were no studies done regarding the positions that were being abolished and no one ever did a study to ascertain the actual duties of each position. Defendants say that this allegation is immaterial and that none of the statements cited by Plaintiff support it. They claim that DeTella was not deposed in this case and that no deposition transcript of DeTella was submitted with Plaintiff's response to the motion for summary judgment. Moreover, although Curry testified that she did not prepare any written studies, she did not testify that no one ever did a study of the duties of the position or outlined what those duties were.

19

## II. ANALYSIS

Defendants assert that they are entitled to summary judgment on all issues--other than the reassignment and leave of absence--because there is no connection between their conduct and the Plaintiff's speech. Defendants further allege that they are entitled to summary judgment on the remaining issues because the Plaintiff's speech was not constitutionally protected. They claim that this is particularly true given that Plaintiff was in a "policymaking" position. Finally, Defendants contend that even if the Plaintiff's speech was protected, it was not clearly established that it was protected; therefore, Defendants are entitled to qualified immunity.

### A. Summary judgment standard

The entry of summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A "material fact" is a fact which may affect the outcome of the litigation, given the substantive

law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). There is a "genuine issue" of material fact when a reasonable juror could find that the evidence supports a verdict for the non-moving party. <u>Id.</u> If a defendant can show the absence of some fact that the plaintiff would have to prove at trial, then the plaintiff must produce evidence, and not merely restate his allegations, to show that a genuine issue exists. <u>Sartor v. Spherion Corp.</u>, 388 F.3d 275, 278 (7th Cir. 2004).

<u>B. Whether the speech was constitutionally protected</u>

1.

The Court will first consider Defendants' argument that Plaintiff's speech was not constitutionally protected. The government generally cannot retaliate against its employees for engaging in constitutionally protected speech. <u>Myers v. Hasara</u>, 226 F.3d 821, 825-26 (7th Cir. 2000). A public employee has a First Amendment right to speak out on matters of public concern even though he works for the government. <u>Id.</u> at 825. The public employee can be punished for exercising his First Amendment right only if the facts demonstrate that the employer's interest in promoting the

efficiency of government services outweighs the employee's interest in free speech.  Id. at 826; see also Pickering v. Board of Education, 391 U.S. 563, 568 (1968).

There are several factors which must be considered by courts when balancing an employee's First Amendment interests against the government employer's interest in providing services efficiently.  These include:

> (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

Kokkinis v. Ivkovich, 185 F.3d 840, 845 (7th Cir. 1999).

As for "policymaking" jobs, however, the government has a "heightened need for trust and confidence" in those employees.  Bonds v. Milwaukee County, 207 F.3d 969, 977 (7th Cir. 2000).  Given the employer's need for allegiance from his policymaking employees, the analysis in these types of cases often "obviates Pickering balancing."  Id.

The policymaking exception is not limited to cases concerning political affiliation.  Warzon v. Drew, 60 F.3d 1234, 1239 (7th Cir. 1995).  "The test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation."  Id. (citation omitted).  "In applying this criterion, however, it is necessary to go beyond labels to consider the nature of the responsibilities in question."  Vargas-Harrison v. Racine Unified School District, 272 F.3d 964, 972 (7th Cir. 2001) (internal quotation marks omitted).

In assessing whether an individual is a policymaker, courts often must carefully examine the amount of discretion that the employee may exercise. Riley v. Blagojevich, 425 F.3d 357, 359 (7th Cir. 2005) ("Above the lowest levels of the civil service the question is not discretion or no discretion but less or more, and in such cases drawing a line is inescapably arbitrary."). Typically, employees who have ministerial duties and therefore very little discretion and employees whose discretion is channeled by professional and

23

not political norms (such as a doctor) are not treated as policymakers for purposes of First Amendment analysis.   <u>Id.</u> at 360.   These lines are sometimes not easy to draw.   <u>Id.</u>

2.

Here, Defendants allege it is clear that Plaintiff occupied a high level position which afforded a meaningful opportunity for input on official decisionmaking.   They further claim that a large amount of an assistant deputy director's time involves reviewing policies and planning programs. According to the affidavit of Associate Director DeTella, moreover, assistant deputy directors are "responsible for enforcing, reviewing, and commenting on agency policies."   Plaintiff also supervised wardens, who were charged with "setting institutional policies."   Defendants further contend that the Plaintiff concedes that he was a "policymaker," in that he developed policy for the Northern Reception and Classification Center.

Defendants allege, therefore, that while the Plaintiff did not actually make policy, his position was a "policymaking" office for First Amendment purposes.   They note that courts have found that persons with equivalent

24

or lower positions to the Plaintiff were in policymaking positions.   In determining that a school principal occupied a policymaking position, the Seventh Circuit emphasized that "she exercised discretion over the organizational structure of her school" and had "meaningful input into government decisionmaking on issues where there is room for principled disagreement." Vargas-Harrison, 272 F.3d at 972-73.

Defendants note that the analysis does not end when it is determined that an employee is a policymaker.  "[T]he policy-maker corollary does not apply, and the courts must apply Pickering balancing, when the speech at issue does not implicate the employee's politics or substantive policy viewpoints." Vargas-Harrison, 272 F.3d at 973 (quotation omitted).  When a policymaker engages in speech which implicates his political viewpoints, "the friction between a politically adverse policy-maker and superior poses such a potential disruption to the efficient functioning of government that a fact-specific inquiry is unnecessary."  Id.  If the speech addresses matters that do not concern his official duties, there is less of a threat that the expression will affect the government's performance of its functions.  Id.  In

those instances the exception does not apply, and "courts must apply the fact-specific <u>Pickering</u> balancing test when the speech at issue does not implicate the employee's politics or substantive policy viewpoints." <u>Id.</u> at 973-74.

Applying these standards, Defendants allege that Plaintiff's speech advocated the release of an organized crime "hitman" on the basis that he had sufficiently paid his debt to society.  They claim that this speech "implicated the broad policy goals of the governor's party toward crime and crime prevention and conflicted with the views of the executive as expressed by the Prisoner Review Board."  Defendants assert, therefore, that the speech falls within the policymaker exception.

Defendants further allege that even if the policymaking exception does not apply, the employee's status as a policymaker remains relevant for purposes of <u>Pickering</u> balancing.  <u>Bonds</u>, 207 F.3d at 981.  Based on the government interests which are involved, there is significant overlap between the policymaking employee exception and <u>Pickering</u> balancing.  <u>Id.</u> Although the employer retains "substantial latitude" to punish policymaking

employees when addressing nonpolitical speech under <u>Pickering</u>, the policymaking employee still retains some First Amendment rights when engaging in nonpolitical speech. <u>Id.</u> at 981-82. Courts "confer substantial weight to the employee's status as a policymaker in applying <u>Pickering</u> to nonpolitical speech, but [courts] also evaluate whether the employer proffers a reasonable connection between the speech and a legitimate rationale for the adverse employment actions." <u>Id.</u> at 982.

Defendants contend that even assuming that the policymaking exception does not apply, there was a rational relationship between the speech and the actions taken by IDOC. Following the Plaintiff's speech, he was moved to a position where he would have no contact with inmates while the matter was investigated. Moreover, Defendants claim that IDOC had to be mindful of adverse publicity generated by Plaintiff's speech. Finally, the Defendants assert that the interests of IDOC outweighed the Plaintiff's interest in speaking, whether or not he was a policymaker.

3.

Plaintiff contends he has already established that there is a genuine

27

issue of material fact regarding whether he is a policymaker.  In an Order entered on March 25, 2004, the Court found that there was a genuine issue of material fact regarding whether Plaintiff was a policymaker, thereby precluding the entry of summary judgment in favor of Defendants on the Plaintiff's First Amendment claims.[4]  Accordingly, Plaintiff claims that the law of the case doctrine should apply to the issue of whether the Plaintiff is a policymaker.

Plaintiff further alleges that his action in speaking to the Prisoner Review Board is the very essence behind the prisoner review hearings.  He notes that the Seventh Circuit, in addressing an IDOC policy which prohibited correctional employees from writing to the Prisoner Review Board on behalf of prisoners, observed that such information could be helpful because "it is the guards who have daily contact with [the inmate] and therefore can realistically assess his person."  Shimer v. Washington, 100 F.3d 506, 508 (7th Cir. 1996).  The court in Shimer also observed that

---

[4]After the previous summary judgment Order, Plaintiff was granted leave to file a third amended complaint.  That explains why the case is again before the Court on a motion for summary judgment.

information from prison guards could be helpful and could also serve to provide inmates with an incentive to behave.  Id. at 510.  One year later, the Seventh Circuit reiterated that information from prison guards could be helpful in assessing clemency petitions.  See Hall v. Washington, 106 F.3d 742, 752 (7th Cir. 1997).   Plaintiff notes that while he is not a prison guard, he possessed the same type of knowledge which would have been effective in speaking to the board.

Plaintiff next alleges that Defendants' argument that he developed policy is wrong in that it misstates his resume and, moreover, the description is of an activity that he did after his demotion in December 2002.  He notes that the resume states that he was assigned to oversee the policy development of the new Northern Reception and Classification Center, and he did not start working there until after he spoke to the Prisoner Review Board.   Plaintiff states that this was the employment/demotion he received after speaking to the board.  Moreover, he was not drafting policy.  Plaintiff's affidavit and those of George DeTella and Nancy Miller state that he was not a policymaker.  Plaintiff further

alleges that Andrew Walter and Sergio Molina were both assistant deputy directors. Both individuals state that they had never made any policies and they were not aware of any others who had that position making policies. According to Walter and Molina, Plaintiff's only input was to express his opinion or comment on whether he liked a policy.

As for Defendants' argument that Plaintiff's speech implicated the broad policy goals of the governor, Plaintiff claims this assertion is "confusing at best" and that there is no evidence in the record pertaining to the policy goals of the governor's party and the views of the Prisoner Review Board. Consequently, he urges that Defendants have not shown that Plaintiff's politics played a role in his speech so as to allow him to fall within the policymaking exception.

Plaintiff further alleges that Defendants have also not offered a rational basis for the adverse employment action. He notes that Defendants argue that IDOC reacted to Plaintiff's speech by moving him to a position where he would not have contact with inmates. But Plaintiff claims that this statement is not supported by any evidence in the record. He notes

that DeTella has stated that Director Snyder offered Plaintiff the opportunity of working at Jesse Ma Houston.  A position at such a facility would have required him to have significant contact with inmates. Accordingly, Plaintiff asserts that Defendants' argument fails to provide a rational basis for the adverse employment action.  Plaintiff contends that because there is at least a genuine issue of material fact as to whether he was a policymaker, summary judgment should not be granted to the Defendants.

4.

In their reply brief, Defendants argue that the issue of whether Plaintiff occupied a policymaking decision has not been litigated and decided.  Rather, this Court in its previous Order simply deferred a decision on the matter, finding that a question of fact remained.  Accordingly, they assert that there is no final decision on an issue to which law of the case would apply.

Next, Defendants contend that Plaintiff's argument that he did not have the authority to promulgate policy is not the only question.  The policymaker exception is not limited to those who have ultimate decision-

31

making authority on policy questions.  Defendants claim that the question is whether Plaintiff occupied a position affording a significant opportunity for input on policy.  The fact that an individual did not have input on policy is not dispositive; the question is whether the position affords the opportunity for such input.  Defendants contend that the evidence in this case establishes that the position afforded such an opportunity, and Plaintiff personally had an opportunity for such an impact.

Defendants next allege that, while Plaintiff asserts that Defendants' Pickering argument fails because there was no connection between the speech and a legitimate rationale for Defendants' actions, Plaintiff does not dispute that the speech created a potential for the disruption of IDOC to such an extent that an investigation was warranted due to the "suspicious nature of plaintiff's speech."

They further note that Plaintiff focuses on the statement that he was moved to a position where he would have no contact with inmates while an investigation was performed.  The affidavit of former Associate Director DeTella states that Director Snyder considered assigning Plaintiff to the

Jesse Ma Houston Adult Transition Center during the investigation.  In that capacity, Plaintiff would have continued to have  contact with inmates. Defendants claim that according to DeTella, the normal practice would have been to lock an employee out of IDOC.  Defendants contend that Plaintiff does not explain how the failure to take the more extreme step of locking him out of IDOC detracts from the legitimacy of their concerns.  Moreover, Defendants allege that the facility in question is a work release center where the residents have regular contact with members of the general public.  They assert, moreover, that the fact that Director Snyder may have considered it appropriate to assign Plaintiff to this position pending an investigation is not inconsistent with the desire to remove him from regular contact with the general prison population.

Following the Seventh Circuit's decision in <u>Riley</u>, 425 F.3d 357, Defendants were granted leave to supplement their memorandum in support of their summary judgment motion.  The Seventh Circuit held that official job descriptions which are reliable are probative as to the policymaker analysis.  <u>Riley</u>, 425 F.3d at 360 ("It seems to us that if no basis is presented

33

for thinking the official job descriptions systemically unreliable in a sense to be explained, the elected officials can rely on them, even if a plaintiff is prepared to testify (self-servingly) that the job description doesn't actually describe what he does, thus precipitating a factual inquiry likely to be protracted and inconclusive.").  In holding that IDOC assistant wardens were policymakers, the Seventh Circuit relied upon the job descriptions made and updated by the Department of Central Management Services. Id. at 363-65.  The court noted that the job descriptions for assistant wardens had not been changed in years.

Defendants allege that Plaintiff has admitted that the Department of Central Management Services established the position description and that only minor changes were made to the position since it was established in March 1999, more than two years before Plaintiff's December 17, 2002 speech to the Prisoner Review Board.  Moreover, the position of assistant deputy director is at least two positions higher in the IDOC chain of command than the assistant wardens at issue in Riley.  Because there is credible evidence that Plaintiff's assistant deputy director position was a

policymaking position, therefore, Defendants contend that Plaintiff's speech was not constitutionally protected. They claim that given Plaintiff's high ranking position in IDOC, his interest in speaking out in his speech to the Prisoner Review Board is outweighed by the interests of the State. Finally, Defendants also assert that they are entitled to summary judgment on the basis of qualified immunity.

The Seventh Circuit has also recently extended the holding in <u>Riley</u> to prison wardens. <u>See</u> <u>Pierson v. Blagojevich, et al.</u>, __ F.3d __, 2006 WL 306926 at *1 (7th Cir. Feb. 10, 2006). The court examined a copy of the plaintiff's warden position that is kept on file at the Illinois Department of Central Management Services and observed, "The essential functions identified in the job description include directing the overall operations and programs of Pinckneyville Correctional Center, formulating 'policy, procedures, rules, regulations, and institutional directives for employees and inmates,' and planning and approving the facility's fiscal budget." <u>Id.</u> The Seventh Circuit concluded that even more than the job description of the assistant warden position addressed in <u>Riley</u>, the job description of a warden

35

clearly conferred policy-making discretion.  Id.  After finding that there was no reason to doubt the validity of the job description, the court determined that the case was controlled by Riley.  Id.  Because political affiliation was determined to be a legitimate requirement of the job, the Seventh Circuit concluded that the defendants were entitled to qualified immunity.  Id.

5.

Based on the foregoing, it is clear that Plaintiff's job description as an assistant deputy director is crucial in determining whether that position would be classified as a policymaking one.  The position description for the position of assistant deputy director was established by the Department of Central Management Services.  That statement provides:

> Subject to management approval of the Deputy Director for District 1, directly supervises and evaluates the performance of all Adult Transition Centers, and District 1 Facilities; assists in the review and assessment of facilities, programs and activities; initiates change as needed; ensures the Agency philosophy, directives, policies and procedures are effectively administered; supervises staff.

The position description goes on to break down the amount of time that an assistant deputy director would typically spend on the various tasks:

1.  As Asst. Deputy Director of District 1, assists in managing, supervising and evaluating the performance of Wardens, Adult Transitional Centers; assists in total planning, organization and administration of programs concerning adult inmates. [25%]

2.  Reviews and audits policies, programs and management practices; makes recommendations regarding changes as deemed necessary; ensures that Agency philosophy and directives [are] properly interpreted and administered; develops and coordinates the integration of programs between components; develops policies and procedures regarding program areas. [25%]

3.  Develops and monitors system and procedures to ensure coordination of services between Correctional Centers, and Adult Transitional Centers. [20%]

4.  Represents Director and Associate Director before the court, other public and private organizations, community groups; maintains liaison with other correctional jurisdictions to remain abreast of state and national trends; confers with other state officials and agencies regarding programs and services; serves as contact person for outside law enforcement agencies. [15%]

5.  Supervises staff; assigns work; approves time off; provides guidance and training; gives oral reprimands and refers employee for more severe discipline; completes and signs performance evaluations; establishes annual goals and objectives. [10%]

6.  Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. [5%]

Assuming the accuracy of the job description, the Court concludes that

an assistant deputy director is a policymaking official.  In determining that an assistant warden is a policymaker, the Seventh Circuit emphasized that a number of tasks in those job descriptions are "judgmental, policy-oriented, and politically sensitive." Riley, F.3d at 363.  Undoubtedly, the same is true here, at least as to the first four paragraphs of the job description. Paragraphs 5 and 6 of the job description are similar to what the Seventh Circuit, in discussing two assistant warden positions, referred to as perhaps "merely professional or ministerial, rather than judgmental, policy-oriented, and politically sensitive." Id.  However, most of these duties are clearly policy-oriented.

Similarly, in discussing the position of warden, the Seventh Circuit noted that duties included "directing the overall operations and programs of Pinckneyville Correctional Center, formulating 'policies, procedures, rules, regulations, and institutional directives for employees and inmates,' and planning and approving the facility's fiscal budget." Pierson, 2006 WL 306926 at *1.  The job description at issue here clearly confers a greater degree of policy-making discretion than that of a warden position.  In fact,

38

an assistant deputy director reviews the work of wardens, given that he "assists in managing, supervising and evaluating the performance of Wardens," among many other tasks.

It appears that a warden is one position below that of an assistant deputy director in IDOC's chain of command. Obviously, an assistant warden would be two positions lower than an assistant deputy director. Given the Seventh Circuit's determination that those two positions are policymaking ones, it would make little sense to reach the opposite conclusion regarding the Plaintiff's position, particularly when wardens and other support staff reported to the Plaintiff.

The question thus becomes whether there is any basis for questioning the reliability of Plaintiff's job description. The Plaintiff does not dispute that the position description for the position of assistant deputy director was established by the Department of Central Management Services with the input of IDOC. Plaintiff also does not dispute that since 1999, the position description has been modified at least two times to make minor changes in the duties, although the duties have remained substantially the

39

same.   While the Plaintiff does take issue at times with Defendants'

characterization of some of his tasks, he does not really dispute the essential

functions of his position as noted in the job description.  Moreover, Plaintiff

acknowledges approving policies, at least in some fashion.  Plaintiff states,

"When Matrisciano 'approved' policies, it simply meant that he had no

objection to it. . .  Matrisciano's input was only to express his opinion or

comment on whether he liked the policy."  Additionally, Plaintiff does not

dispute Defendants' allegation that "Assistant Deputy Directors were

responsible for enforcing, reviewing, and commenting on the agency

policies."

Plaintiff also does not specifically dispute Defendants' allegation that

as an assistant deputy director of IDOC, he made recommendations

regarding IDOC's policy.  Plaintiff states only that he does not recall doing

this.

Plaintiff also further alleges that his affidavit--as well as those of

George DeTella and Nancy Miller--state that he was not a policymaker.

However, DeTella's affidavit says nothing about whether Plaintiff was a

policymaker.  Nancy Miller, an attorney and former IDOC employee, did state, "As an Assistant Deputy Director, Ronald Matrisciano was not a policymaker.  Mr. Matrisciano's duty was to implement and enforce policies."  Plaintiff says essentially the same thing: "While assistant Deputy Director, I did not make policy.  I would receive, via e-mail, policy proposals.  I was given the opportunity to respond to the e-mails if I so chose.  I never promulgated any policies nor did I have any meaningful input into the policies.  I would follow and enforce the policies."

In contending that he was not a policymaker, Plaintiff also refers to the depositions of Andrew Walter and Sergio Molina, both of whom were once assistant deputy directors with IDOC.  Walter stated that during the three months he was an assistant deputy director, he did not set any policy. Moreover, Walter was not aware of the Plaintiff setting policy.  Similarly, Molina stated that he did not recall issuing any policy directives while he was an assistant deputy director.  Molina further stated that policy is set by the director's office, and he was not aware of the Plaintiff or any other assistant deputy director issuing a policy directive.

41

At first glance, it might appear that Plaintiff has created a factual dispute on the policymaker issue. The Court concludes otherwise. This is particularly true in light of the Seventh Circuit's pronouncements as to who constitutes a policymaker within the hierarchy of IDOC. It appears that the individuals who stated that the Plaintiff was not a policymaker have a narrow view as to the definition of policymaker–as if Plaintiff had to specifically issue a policy directive to be followed by wardens and their support staff. Plaintiff's statement that he received policy proposals via e-mail and had the opportunity to respond demonstrates that he was a policymaker. The fact that Plaintiff did not respond to these proposals does not mean that he was not a policymaker. What is important is that he could have responded. "Our focus is on the 'inherent powers' of the office, not what any individual officeholder does." Riley, 425 F.3d at 360-61 (citations omitted).

The job description of an assistant deputy director refers to a number of tasks that are "judgmental, policy-oriented, and politically sensitive." See Riley, 425 F.3d at 363. Plaintiff was one of the top officials within IDOC's

42

hierarchy. Based on Plaintiff's allegation that he did not report to a deputy director, it would appear that the only officials who outranked him and the other four assistant deputy directors were Associate Director George DeTella and Donald Snyder, the Director of IDOC.

In determining that an assistant warden is a policymaker the Seventh Circuit stated, "The operation of the state's prisons costs more than a billion dollars a year and is one of the major functions of Illinois state government, and, as the descriptions make clear, not all the policy judgments required for their operation can be made by the top officials in the Department of Corrections." Id. Given the Seventh Circuit's recent determinations that assistant wardens and wardens are policymakers, the Court concludes that an assistant deputy director, as a top official of IDOC, is also a policymaker.[5] Based on Plaintiff's job duties, there is no question that he had meaningful input into IDOC's decisionmaking. See Warzon, 60 F.3d at 1239 ("The test is whether the position held by the individual authorizes,

_____

[5]This is not inconsistent with the Court's previous determination that there is a genuine issue of material fact regarding whether the Plaintiff was a policymaker. Since March 2004, the Seventh Circuit has significantly clarified the state of the law on this issue.

43

either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.").

6.

The determination that Plaintiff was a policymaker does not end the analysis.  "[I]n certain instances, 'the government employer's need for political allegiance from its policymaking employee outweighs the employee's freedom of expression to such a degree' that the fact-specific Pickering inquiry is not required."  Vargas-Harrison, 272 F.3d at 973 (quoting Bonds, 207 F.3d at 977).  Accordingly, "this corollary applies when a policy-making employee engages in speech that implicates his political viewpoints."  Id.  This is based on the potentially significant disruption that could ensue, thereby interfering with the efficient functioning of government.  Id.  If the "employee's speech addresses matters that have no impact on his official duties, there is a diminished threat that this expression will hamper the government's performance of its functions."  Id.  In these instances, when the employee's politics or substantive policy viewpoints are

not implicated, courts must apply the fact-specific <u>Pickering</u> balancing test. <u>Id.</u> at 973-74.

The speech at issue here clearly had an impact on Plaintiff's official duties or substantive policy viewpoints. One of his duties, according to the job description, was to ensure that IDOC's philosophy and directives were properly interpreted and administered. Moreover, Plaintiff does not dispute that IDOC received what it perceived to be negative press because of the Plaintiff's support for the early parole release of Harry Aleman. Plaintiff also acknowledges that IDOC received information that members of the Prisoner Review Board were not happy with the Plaintiff's testimony.[6] Given Plaintiff's high position within the hierarchy of IDOC, the Court concludes that the speech at issue here implicated his substantive policy viewpoints.

In this instance, the employer's need for allegiance outweighed Plaintiff's freedom of speech. The Court concludes that Defendants Walker

---

[6]The Defendants also allege that the Plaintiff's speech implicated the broad policy goals of the governor's party. However, there does not appear to be any evidence in the record regarding those policy goals.

and Snyder are entitled to summary judgment on this basis.

## III. CONCLUSION

Having concluded that Plaintiff was a policymaker and that his speech was not entitled to protection, the Court need not address the Defendants' alternative arguments as to why they are entitled to summary judgment.

Previously, the Court noted that one of the Counts in Plaintiff's third amended complaint appeared to be directed at Michael M. Rumman, the Director of the Illinois Department of Central Management Services. Another count purported to allege that Rumman conspired with Walker.

The third amended complaint appears to be the only indication that Rumman is a part of this case. There is no indication that Rumman was ever served with a summons and a copy of the complaint. It does not appear that he ever appeared in this action. These counts deal with the controversy over whether the Plaintiff should have been recalled for a position as a public service administrator. Because the Defendants acknowledged the error and Plaintiff was placed on the recall list and awarded the position to which he was entitled, the Court concludes that

Plaintiff did not pursue these claims.

Ergo, Defendants' motion for summary judgment is ALLOWED.

The Clerk of Court will enter judgment in favor of the Defendants.

This case is closed.

Enter: February 23, 2006

FOR THE COURT:

s/Richard Mills
United States District Judge